## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

RALPH GREEN,               :
      Plaintiff,         :
                :
v.                         :        **3:22cv129 (MPS)**
                :
LIEUTENANT FRANCO,         :
et al.,                    :
      Defendants.        :

## <u>INITIAL REVIEW ORDER</u>

The *pro se* plaintiff, Ralph Green, is a sentenced inmate[1] housed at the MacDougall-Walker Correctional Institution ("MacDougall") of the Connecticut Department of Correction ("DOC"). He filed this civil rights complaint pursuant to 42 U.S.C. § 1983, alleging claims against DOC employees who work at Osborn Correctional Institution ("Osborn")—Lieutenant Franco, Warden Guadarrama, Deputy Warden Vasquez, Correction Officer Ortega (collectively, "Osborn Defendants")—and DOC employees who work at MacDougall—Captain Concepcion, Captain Stanley, Correction Officer Mathews, Correction Officer Mancini, Disciplinary Hearing Officer Brown, Captain Salius, and District Administrator Nick Rodriguez (collectively, "MacDougall Defendants") . Compl. [ECF No. 1]. Green has also named CTO Grady as a defendant in the case caption; CTO Grady is not otherwise mentioned in the complaint.

---

[1] The Connecticut DOC website reflects that Green was sentenced on November 18, 2016 to a term of incarceration that has not expired. *See* http://www.ctinmateinfo.state.ct.us/detailsupv.asp?id_inmt_num=407230*; Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012) (court may "take judicial notice of relevant matters of public record.").

Green asserts claims against Defendants in their individual and official capacities based on violations of his constitutional rights while he was confined at both Osborn and MacDougall. *Id.* He seeks damages and declaratory relief. *Id.* at 23.

For the following reasons, the Court will permit some of Green's Eighth and First Amendment claims against Lieutenant Franco in his individual capacity to proceed beyond initial review and will dismiss the remaining claims.

## I.     STANDARD OF REVIEW

Under 28 U.S.C. § 1915A, the Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555-56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678 (citing *Bell Atlantic*, 550 U.S. at 556).

Nevertheless, it is well-established that "[*p*]*ro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470

F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir.

2010) (discussing special rules of solicitude for *pro se* litigants).

## II.    ALLEGATIONS

For purposes of initial review, the Court considers all of the following allegations to be

true.

Green has a long history of severe mental illness including Bi-Polar Disorder and Post-

Traumatic Stress Disorder ("PTSD"). Compl. at ¶ 29.

On the morning of October 7, 2020, Green was housed at Osborn. *Id.* at ¶ 30. Lieutenant

Franco of the Osborn Intelligence Unit removed Green and five other inmates from the J-2 block

for having failed their urinalysis tests for drugs. *Id.* Green was issued two disciplinary reports

(Intoxication and Removal from Program) and placed in segregation under the direction of

Lieutenant Franco. *Id.* at ¶ 31.

At that time, Osborn was on an emergency lockdown due to COVID-19. *Id.* at ¶ 32.

Every prisoner was permitted to shower and make a telephone call every day under Warden

Guadarrama's policy. *Id.*

Lieutenant Franco arrived at Green's cell on October 8, 2020, First Shift at 9:30 AM. *Id.*

at ¶ 33. He asked Green which staff member had provided him with the drugs. *Id.* at ¶ 33. Green

indicated that he did not know what Franco was asking about. *Id.* Lieutenant Franco informed

him that if he did not provide information about the staff member who brought him drugs,

Franco would "fuck" his life. *Id.*

On the morning of October 8, Green had a COVID-19 test that returned a negative result.

*Id.* at ¶ 34.

On the morning of October 10, Lieutenant Franco arrived at Green's cell to determine whether Green had changed his mind about identifying the correction officer who was providing drugs to prisoners at Osborn. *Id.* at ¶ 35. Green indicated that he had no knowledge about where the drugs had come from. *Id.* at ¶ 36. Franco responded with a remark of a threatening nature. *Id.* at ¶ 37.

On October 14, Green's security risk level was raised from a three to a four by Deputy Warden Vasquez, which Green asserts was a "revenge transfer." *Id.* at ¶¶ 13, 38. Green's status changed to "pending transfer," and he was moved to cell #91 in segregation. *Id.* at ¶ 39.

Green asserts that DOC Administrative Directive 9.2 provides that two disciplinary reports from one incident cannot be used to raise an inmate's risk level,[2] but Lieutenant Franco made sure that Green was charged with "both class A tickets" for his charges of Intoxication and Removal from a Program separately based on the same incident. *Id.* at ¶ 38.

On October 15, Green asked Lieutenant Franco when he would get his regular showers and telephone calls. *Id.* at ¶ 40. Lieutenant Franco indicated that Green would not be getting anything. *Id.*

---

[2] The Court takes judicial notice of publicly-available Administrative Directive 9.2(c)(12)(A), which provides:

> An inmate who is found guilty of a level 2 assault on a Department of Correction employee as defined in Administrative Directive 6.6, Reporting of Incidents, shall be classified to overall risk level 4 with a corresponding increase in the Discipline Risk Factor.

> In the event of multiple disciplinary charges arising from a single disciplinary incident, only the highest chargeable class of offense shall be used.

Green wrote to Deputy Warden Vasquez about his lack of showers and telephone calls but received no response. *Id.* at ¶ 41. Green later wrote to Vasquez about "extreme temperature" and not receiving every day showers and telephone calls. *Id.* at ¶ 42.

On October 29, Green wrote to Vasquez about his not having received recreation and regular showers and telephone calls. *Id.* at ¶ 43. He asked Vasquez why he had not received an answer to his complaints about recreation, showers and telephone calls, but Vasquez did not respond. *Id.*

On October 30, after Lieutenant Franco walked away from Green's cell, Green was taken to the quarantine unit in F-Block to use the telephone with no mask. *Id.* at ¶ 45. He was unaware that the telephone had been designated by Lieutenant Franco for prisoners sick with COVID-19. *Id.*

During the afternoon of that same day, Green was in his cell when Lieutenant Franco informed him that he had reviewed Green's pictures and was aroused by pictures of Green's "girl." *Id.* at ¶ 46. Lieutenant Franco indicated that that he would be keeping the pictures; and after he unzipped his pants, Lieutenant Franco exposed his penis and inquired whether Green had a bigger penis. *Id.* He "ejaculate[ed] his penis in a downward motion with a crazed look in his eyes" and told Green that he would "stuff [his penis] in [Green's] girl[']s ass." *Id.* at p. 3 ¶ D, ¶ 46. Green was confused and shocked after Franco walked away. *Id.* at ¶ 46.

On November 3, under the direction of Lieutenant Franco, Green was again taken to the quarantine telephone in the F-Block to call his family. *Id.* at ¶ 47. After he finished using the telephone, Green was escorted back to #91 cell, where Lieutenant Franco was waiting by the

stairs. *Id.* at ¶ 48. Lieutenant Franco stated that he hoped that Green's immune system was strong because Green had been using the telephone for people who are sick. *Id.*

On November 6, Green was visited by a mental health doctor because he was anxious, depressed and sick. *Id.* at ¶ 49.

On November 11, Green tested positive for COVID-19. *Id.* at ¶ 51. He was transferred to MacDougall's COVID-19 Unit for treatment. *Id.* at ¶ 52. Green's property was delivered to MacDougal from Osborn on November 18 but was missing his discovery papers from his legal case, his address book, pictures of his wife in her bra and underpants, and sexually-oriented letters from his wife. *Id.* at ¶¶ 53-54.

On November 20, Green was moved from the quarantine unit to the O-Pod, a population unit for Level-4 prisoners. *Id.*

Green's mother contacted Lieutenant Franco at Osborn by telephone to ask about Green's missing property. *Id.* at ¶ 56. Franco informed Green's mother that Green would not be getting his property back; he also indicated that if Green continued to write grievances against him, he would "bury" Green in the Security Risk Group ("SRG") Program and take away all of Green's privileges and his parole. *Id.*

On November 28, Green wrote a grievance about Lieutenant Franco threatening his mother. *Id.* at ¶ 57.

On December 7, Green was called to the MacDougall medical unit and met by the Intelligence Unit led by MacDougall Captain Concepcion. *Id.* at ¶ 58. He was taken to segregation for an SRG ticket that Lieutenant Franco sent to MacDougall Captain Stanley sixty days after the initial incident at Osborn. *Id.* at ¶ 58. Green alleges that Officer Ortega wrote the

SRG ticket in retaliation for Green's grievance filing and failure to comply with the drug investigation. *Id.* at ¶ 14.

MacDougall Captains Stanley and Concepcion had approved the SRG ticket written at Osborn. *Id.* at ¶ 15. MacDougall Officer Mathews, an investigator, also approved the SRG ticket. *Id.* at ¶ 17. Green alleges that Officer Matthews, Officer Mancini, Captain Stanley, and Captain Concepcion found him guilty of the SRG offense two days later without a hearing. *Id.* at ¶¶ 15-18. MacDougall Officers Mathews and Mancini both claimed that Green had verbally pleaded guilty to the SRG offense. *Id.* at ¶¶ 17-18.

On December 10, Green was placed in segregation at MacDougall as an SRG inmate. *Id.* at 59.

On December 15, Green saw Disciplinary Hearing Officer ("DHO") Brown, who had been appointed as the hearing officer at MacDougall. *Id.* at ¶ 19. DHO Brown asked him if he wanted to plead guilty. *Id.* at ¶ 61. He replied, "No." *Id.* DHO Brown refused to show him the evidence against him but stated that she found him guilty. *Id.* She said she had only seen a report from Lieutenant Franco and that there was no need for a hearing because he was guilty. *Id.* Brown told Green to sign the "ticket" and admit to his guilt or to sign that he "refused." *Id.* Green signed "refused" in cursive and DHO Brown printed Green next to where Green wrote "refused." *Id.* at ¶ 61. Brown claimed that Green had pleaded guilty verbally even though he had written "refusal" in cursive as instructed. *Id.* at ¶ 19.

On December 15, Green received a Class A SRG "ticket" with sanctions that said he had pleaded guilty. *Id.* at ¶ 62. Green had not pleaded guilty. *Id.*

7

He was then moved into the SRG Unit by Captain Salius, who changed Green's status to a Level-5 inmate, thereby rendering him ineligible for parole. *Id.* at ¶¶ 20, 63.

That same day, Green filed an appeal of his SRG Class A ticket. *Id.* at ¶ 64.

On January 26, 2021, District Administrator Nick Rodriguez denied Green's appeal, claiming that Green had entered a verbal guilty plea and signed all documentation with "indistinct cursive style autographs." *Id.* at ¶ 65.

Green asserts that he was held "captive" and assaulted and tortured for twenty-eight days and denied the basic rights of the rest of the Osborn inmate population while confined at Osborn because Defendants believed he had information about correctional staff providing drugs to the inmate population but would not cooperate with their investigation. *Id.* at ¶¶ 5, 12. He complains that Lieutenant Franco did not afford him regular showers or recreation for twenty-eight days and deprived him of telephone privileges for twenty-one days. *Id.* at ¶ 11.

Green suffers from permanent breathing problems because he was exposed to COVID-19 and was deathly ill for two weeks. *Id.* at ¶ 66. He now has to use an inhaler at night because he wakes up unable to breathe at night as a result of his contraction of the COVID-19 virus. *Id.*

He is allegedly still housed at the MacDougall SRG Unit, where he has no telephone privileges, no or limited commissary, no employment, one thirty-minute visit per week, and no religious services. *Id.* at ¶¶ 3, 9.

## III.   DISCUSSION

The Court construes Green's complaint as raising claims under the Eighth Amendment based on his exposure to COVID-19, sexual harassment, and his conditions of confinement; the Fourth Amendment; the First Amendment; and the Fourteenth Amendment Due Process Clause.

8

As an initial matter, the Court notes that Green has not alleged any facts about CTO

Grady in the body of the complaint. It is well settled in this Circuit that 'personal involvement of

defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §

1983.'" *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*,

950 F.2d 880, 885 (2d Cir. 1991)). Thus, Green has failed to state a plausible claim that CTO

Grady violated his federally or constitutionally protected rights. *See Cruz v. MHSW Bill*, No.

3:18-CV-01544 (VAB), 2021 WL 1518376, at *2 (D. Conn. Apr. 16, 2021). The Court must

dismiss Grady as a defendant in this action.

The Court considers next Green's claims under section 1983 against the Osborn

Defendants in their individual capacities.

### A.      Eighth Amendment

The Eighth Amendment to the United States Constitution protects against the infliction of

cruel and unusual punishment. *See* U.S. Const. amend. VIII. To state an Eighth Amendment

claim for unconstitutional conditions of confinement, a plaintiff must allege facts supporting an

objective element—that "the deprivation was sufficiently serious that he was denied the minimal

civilized levels of life's necessities"—and a subjective element—that the defendants "acted with

a sufficiently culpable state of mind, such as deliberate indifference to inmate health or

safety." *Washington v. Artus*, 708 F. App'x 705, 708 (2d Cir. 2017) (summary order)

(quoting *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013)) (internal quotation marks omitted).

Under the objective component, there is no "bright line test" to determine whether a risk

of serious harm is "substantial" for Eighth Amendment purposes. *Lewis v. Siwicki*, 994 F.3d 427,

432 (2d Cir. 2019). The court must "assess whether society considers the risk that the prisoner

complains of to be so grave that it violates contemporary standards of decency to expose *anyone* unwillingly to such a risk," *i.e.*, "the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993) (emphasis in original). The court makes this determination in light of the steps the facility has already taken to mitigate the danger. *Id.*

To satisfy the subjective component, a plaintiff must allege that the defendants knew that he faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *see also Phelps v. Kapnolas*, 308 F.3d 180, 185-86 (2d Cir. 2002) (defendant must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed] and he must also [have] draw[n] that inference"). Regarding the subjective component, a plaintiff must show that each defendant (including supervisory officials) through his own actions, violated his rights; thus, for his Eighth Amendment claims he must show that each defendant was personally aware of and disregarded an excessive risk of harm.[3]

### 1. **COVID-19 Exposure**

Green has alleged that Lieutenant Franco intentionally exposed him to the COVID-19 virus by having him use the telephone used by inmates quarantined after testing positive for COVID-19. "[C]orrectional officials have an affirmative obligation to protect inmates from

---

[3] In *Tangreti v. Bachmann*, the Second Circuit explained that "there is no special rule for supervisory liability. Instead, a plaintiff must plead and prove 'that each Government-official defendant, through the official's own individual actions, has violated the Constitution.' ... The violation must be established against the supervisory official *directly*." *Tangreti*, 983 F.3d 609, 618 (2d Cir. 2020) (emphasis added) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)). Thus, in order to "hold a state official liable under § 1983, a plaintiff must plead and prove the elements of the underlying constitutional violation directly against the official without relying on a special test for supervisory liability." *Id.* at 620.

infectious disease." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996). Courts have found that "an inmate can face a substantial risk of serious harm in prison from COVID-19 if a prison does not take adequate measures to counter the spread of the virus." *Chunn v. Edge*, 465 F. Supp. 3d 168, 200-01 (E.D.N.Y. 2020) (citing cases).

For initial pleading purposes only, Green's allegations satisfy the objective component for an Eighth Amendment claim. As Green has alleged facts suggesting that Lieutenant Franco took steps to expose him to COVID-19, the Court considers the allegations sufficient to assert a plausible claim of deliberate indifference to Green's health and safety against Lieutenant Franco.

Because no facts indicate that Warden Guadarrama, Deputy Warden Vasquez, or Correction Officer Ortega had any direct involvement with Green's exposure to the COVID-19 virus, this claim will proceed against only Lieutenant Franco.

### **Verbal and Sexual Harassment**

Green alleges verbally harassing conduct by Lieutenant Green. It is well-settled that verbal harassment and threats do not rise to the level of a constitutional violation. *See Cole v. Fischer*, 379 F. App'x 40, 43 (2d Cir. 2010) ("Verbal harassment, standing alone, does not amount to a constitutional deprivation."); *Cuoco v. Moritsugu,* 222 F.3d 99, 109 (2d Cir. 2000) (noting that "rudeness and name-calling does not rise to the level of a constitutional violation"). Verbal harassment alone does not meet the objective component of an Eighth Amendment conditions claim because it does not deprive an inmate of a basic human need.

An Eighth Amendment claim of sexual abuse by a prison officer or official may be stated, however, by meeting both a subjective and an objective element. *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997). With regard to the objective element:

11

> Sexual abuse may violate contemporary standards of decency and can cause severe physical and psychological harm.... For this reason, there can be no doubt that severe or repetitive sexual abuse of an inmate by a prison official can be objectively, sufficiently serious enough to constitute an Eighth Amendment violation.... Moreover, like the rape of an inmate by another inmate, sexual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is simply not part of the penalty that criminal offenders pay for their offenses against society.

*Id.* (internal quotation marks and citations omitted). To meet the subjective element, an inmate must allege facts to show that the prison officer or official acted with a "'sufficiently culpable state of mind.'" *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)). In *Crawford*, the Second Circuit held that "a corrections officer's intentional contact with an inmate's genitalia or other intimate area, which serves no penological purpose and is undertaken with the intent to gratify the officer's desire or to humiliate the inmate, violates the Eighth Amendment." *Id.* at 257. Thus, one isolated incident of sexual abuse that was "sufficiently severe or serious" could constitute conduct that was sufficiently serious or harmful enough to offend contemporary standards of decency and to meet the objective prong of the Eighth Amendment standard. *Id.* "In determining whether an Eighth Amendment violation has occurred, the principal inquiry is whether the contact is incidental to legitimate official duties, such as a justifiable pat frisk or strip search, or by contrast whether it is undertaken to arouse or gratify the officer or humiliate the inmate." *Id.* at 257–58.

This Court has previously held that the lack of physical contact does not preclude an Eighth Amendment claim for sexual abuse. *See White v. Doe*, No. 3:16-CV-01874 (JAM), 2021 WL 4034164, at *8 (D. Conn. Sept. 3, 2021) (noting "prison guard's repeated acts of compelling a prisoner to engage in sex acts in a flagrantly degrading and humiliating manner" was sufficient if proven to support an Eighth Amendment violation based on cruel and usual punishment).

12

Generally, an inmate's claim that a correctional officer made harassing statements about an inmate's genitalia alone is not sufficient for an Eighth Amendment violation absent any physical contact with the alleged perpetrator or without any alleged egregious sexual conduct. *See Bell v. Tromblee*, No. 9:18-CV-0814L (EK/DEP), 2018 WL 6000146, at *3 (N.D.N.Y. Nov. 15, 2018) (dismissing Eighth Amendment claim against correctional officer who allegedly made harassing comments about inmate's genitalia) (internal citations omitted); *see also Keaton v. Ponte*, No. 16 CIV. 3063 (KPF), 2017 WL 3382314, at *10 (S.D.N.Y. Aug. 4, 2017) (dismissing prisoner's Eighth Amendment claims of sexual abuse against female corrections officers where there was no "illicit physical contact between a corrections officer and an inmate" and the corrections officer's alleged "verbal harassment," encouraging inmate to use shower, watching him shower, and making sexual gestures with lipsticks and tongues, "without more, [were] not actionable" as cruel and unusual punishment in violation of the Eighth Amendment).

In this instance, Green has alleged that Lieutenant Franco made disparaging remarks about his genitalia and masturbated in front of him while he made threatening remarks about Green's "girl." Compl. at p. 3 ¶ D, ¶ 46. For initial pleading purposes, the Court considers these allegations sufficient to raise an inference that Lieutenant Franco engaged in egregious sexual conduct for purposes of humiliating and intimidating Green without legitimate penological purpose. No facts indicate that Warden Guadarrama, Deputy Warden Vasquez, or Correction Officer Ortega engaged in any sexual harassment of Green. Thus, Green may proceed only on his Eighth Amendment sexual harassment claim against Lieutenant Franco.

**<u>Showers</u>**

13

Green alleges that Lieutenant Franco deprived him of his "regular showers" for 28 days, and that he wrote to Deputy Warden Vasquez that he was not receiving his showers every day or "regular showers." Compl. at ¶¶ 11, 40-43.

Inmates have a right to sanitary living conditions and the necessary materials to maintain adequate personal hygiene. *Walker v. Schult*, 717 F.3d 119, 127 (2d Cir. 2013) ("recogniz[ing] that unsanitary conditions in a prison cell can, in egregious circumstances, rise to the level of cruel and unusual punishment" and citing cases for the proposition that "the failure to provide prisoners with toiletries and other hygienic materials may rise to the level of a constitutional violation"). The determination of whether an unsanitary condition states a claim under the Eighth Amendment "depends on both the duration and severity of the exposure." *Willey v. Kirkpatrick*, 801 F.3d 51, 68 (2d Cir. 2015). The Second Circuit has rejected "any bright-line durational requirement for a viable unsanitary-conditions claim[.]" *Id.* (reversing district court's dismissal for failure to state an Eighth Amendment conditions of confinement claim where inmate plaintiff alleged that while kept naked in a strip cell, he was exposed, at a minimum, to seven days of human waste).

District courts in the Second Circuit have held that a temporary denial of access to a shower does not rise to the level of a serious deprivation of a human need. *See Rogers v. Faucher*, No. 3:18-cv-01809 (JCH), 2019 WL 1083690, at *5 (D. Conn. Mar. 7, 2019) (6-day deprivation of shower use did not constitute sufficiently serious deprivation of a human need); *George v. McGinnis*, 2008 WL 4412109, at *4–5 (W.D.N.Y. Sept. 23, 2008) (deprivation of showers for thirteen days does not satisfy the objective element of Eighth Amendment claim); *McCoy v. Goord*, 255 F. Supp. 2d 233, 260 (S.D.N.Y. 2003) ("two-week suspension

of shower privileges does not suffice as a denial of basic hygienic needs") (internal quotation marks and citation omitted).

Here, Green's complaint about being deprived of a shower every day or "regular showers" fails to suggest that he sustained a substantial deprivation of a basic human need based on an inability to maintain hygiene. To the extent that he complains that Defendants violated a prison policy set by the Warden or provision under a settlement agreement, such violation does not give rise to a violation of 42 U.S.C. § 1983. *See Harris v. Taylor*, 441 F. App'x. 774, 775 (2d Cir. 2011) (non-compliance with state law or prison administrative directive does not by itself establish a due process violation under § 1983); *Mejia v. Kurtzenacker*, No. 3:21CV1222 (MPS), 2022 WL 19331, at *10 (D. Conn. Jan. 3, 2022) ("An allegation that a prison official did not adhere to a state law, regulation or prison directive or policy does not rise to the level of a violation of a federally or constitutionally protected right.").

Because Green has not asserted sufficient facts concerning his lack of showers to meet the objective element of the Eighth Amendment standard, this claim must be dismissed as not plausible.[4]

**Recreation**

Green alleges that on October 29, 2020, he wrote to Deputy Warden Vasquez about not receiving recreation. Compl. at ¶ 43. The Supreme Court considers exercise to be a basic human

---

[4] In addition, even before *Tangreti*, a supervisory official's receipt of a letter from an inmate, without more, was considered insufficient to establish the official's personal involvement in a § 1983 constitutional claim. *Braxton v. Bruen*, No. 917CV1346 (BKS/ML), 2021 WL 4950257, at *6 (N.D.N.Y. Oct. 25, 2021) (citing *Jones v. Annucci*, No. 16-cv-3516, 2018 WL 910594, at *11–12, (S.D.N.Y. Feb. 14, 2018) (noting that Acting Commissioner's failure to respond to the plaintiff's letter complaining of unconstitutional conduct, "without more, does not plausibly allege his personal involvement" and citing cases)) (other citations omitted).

need protected by the Eighth Amendment. *See Wilson v. Seiter*, 501 U.S. 294, 304-05 (1991). The Second Circuit has recognized that the Constitution requires "that prison inmates be allowed some out-of-cell exercise." *Williams v. Greifinger*, 97 F.3d 699, 704 n.5 (2d Cir. 1996). Prison officials may limit the right to out-of-cell exercise, however, where there is a valid "safety exception" or certain "unusual circumstances." *Id.* at 704 (holding that segregated confinement for long periods does not violate Eighth Amendment if inmate is provided opportunity for exercise). "Although deprivations of physical exercise for short periods will not rise to constitutional dimension, Eighth Amendment claims for periods far shorter than [] four months … have been held viable." *McCray v. Lee*, 963 F.3d 110, 117 (2d Cir. 2020) (citing cases holding that seven- or six-and-a-half-week deprivation of exercise could constitute constitutional violation). In addition, a prisoner's opportunity to exercise within his cell does not necessarily mean that he had a meaningful opportunity to exercise, and courts have permitted such Eighth Amendment opportunity-to-exercise claims to go forward "where those claims exclusively concerned impediments to out-of-cell exercise." *Edwards v. Quiros*, 986 F.3d 187, 194 (2d Cir. 2021).

Green's complaint alleges that he was deprived of recreation for less than one month or 28 days. Compl. at ¶ 11, 12. Further, Green has alleged only that he was not afforded recreation rather than facts indicating that he had no meaningful opportunity for out-of-cell exercise. *See Marcus v. Annucci*, No. 20-CV-06234 (PMH), 2022 WL 280935, at *6 (S.D.N.Y. Jan. 31, 2022) (dismissing claim based on 90-day loss of recreation privilege). Accordingly, this claim must be dismissed as not plausible.

**<u>Temperature</u>**

Green alleges that he wrote to Deputy Warden Vasquez on October 22, 2020 about "extreme temperatures." Compl. at ¶ 42. Green has not, however, alleged a violation of the Eighth Amendment based on his exposure to extreme temperatures.

An inmate's alleged prolonged exposure to excessive heat or cold temperatures can present a constitutional violation. *See McFadden v. Noeth*, 827 F. App'x 20, 29 (2d Cir. 2020) (prolonged exposure to cold may be unconstitutional) (summary order); *Gaston v. Coughlin*, 249 F.3d 156, 165 (2d Cir. 2001) (complaint "alleged that during the following winter, there were broken windows in Gaston's cell block, and that despite numerous complaints, the windows remained unrepaired for the entire winter, exposing inmates to freezing and sub-zero temperatures."). Although there is no bright-line durational or severity threshold for such constitutional deprivation, plaintiffs have generally succeeded where the claims involved an alleged exposure for a "more prolonged period of time than eleven hours." *Ford v. Aramark*, No. 18-CV-2696 (NSR), 2020 WL 377882, at *7 (S.D.N.Y. Jan. 23, 2020) (citations and quotations omitted).

Green's complaint has only referenced his exposure to "extreme temperatures." He has not alleged facts indicating that he was exposed for a prolonged period of time to excessively hot or cold temperatures that posed a serious risk of harm to his health and safety.   Accordingly, Green has not alleged a plausible Eighth Amendment claim based on his exposure to extreme temperatures.

**<u>Telephone</u>**

To the extent that Green alleges that his loss of telephone privileges constituted an Eighth Amendment violation, this claim must be dismissed as not plausible. Green alleges that he lost

17

access to the telephone while in segregation for 21 days. Compl. at ¶ 11. Green's allegations do not, however, describe a deprivation of a basic human need, e.g., food, clothing, shelter, medical care or reasonable safety. *See Marcus v. Annucci*, No. 20-CV-06234 (PMH), 2022 WL 280935, at *6 (S.D.N.Y. Jan. 31, 2022) (45-day loss of telephone privileges could not support an Eighth Amendment claim); *Baltas v. Erfe*, No. 19-CV-01820, 2020 WL 1915017, at *26 (D. Conn. Apr. 20, 2020) ("An inmate has no Eighth Amendment right to visitation or to make social telephone calls."). Thus, the Court must dismiss this Eighth Amendment claim as not plausible.

**B.    First Amendment**

The Court considers whether Green has alleged a First Amendment violation based on restriction of his telephone use and retaliation for his exercise of his constitutional rights. "While prison walls do not separate inmates from the protections of the constitution ... the Supreme Court has acknowledged that the fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration." *Nicholas v. Raro*, No. 95–CV–379 (H), 1997 WL 255291, at *2 (W.D.N.Y. Apr. 7, 1997) (internal quotations omitted; citations omitted). "A prison inmate ... retains those First Amendment rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system." *Giano v. Senkowski,* 54 F.3d 1050, 1053 (2d Cir. 1995).

**Telephone**

As a preliminary matter, this Court's research revealed no Supreme Court or Second Circuit cases holding that the First Amendment guarantees a prisoner the right to telephone use. *See Baxter v. Wagner*, 802 F. App'x 32, 33 n.1 (2d Cir. 2020) ("This Court has not

addressed whether a prisoner has a First Amendment right to make phone calls, but at least one

Circuit has held they do in at least some circumstances."); *McMillian v. Cty. of Onondaga*, 710

F. App'x 458, 460 (2d Cir. 2017) ("Assuming, without deciding, that a prisoner has a limited

right to use a telephone to communicate with his attorney and perhaps others...."). Courts within

the Second Circuit considering prison telephone restrictions have held that "[p]risoners have no

constitutional right to unlimited telephone use." *Altayeb v. Chapdelaine*, 3:16-CV-00067 (CSH),

2016 WL 7331551, at *6 (D. Conn. Dec. 16, 2016) (citing *See Pitsley v. Ricks*, No. 96-0372,

2000 WL 362023, at *4 (N.D.N.Y. March 31, 2000)); *see also Bellamy v. McMickens*, 692 F.

Supp. 205, 214 (S.D.N.Y. 1988) (explaining that "states have no obligation to provide the best

manner of access to counsel" and "restrictions on inmates' access to counsel via the telephone

may be permitted as long as prisoners have some manner of access to counsel"). Restrictions on

telephone usage do not infringe on inmates' First Amendment rights if alternate means of

communicating with others outside of prison are available. *See Riddick v. Arnone*, No.

3:11cv631(SRU), 2012 WL 2716355, at *3, 6 (D. Conn. July, 2012) (dismissing claim that

prison officials denied plaintiff access to telephone on ground that inmates do not have a

"constitutional right to unrestricted telephone use" and plaintiff did not allege that he was barred

from communicating through mail during period when he could not use telephone); *Martinez v.

Healey*, No. 14-CV-302 NSR, 2014 WL 5090056, at *3–4 (S.D.N.Y. Oct. 10, 2014) ("Because

there is no right to unlimited telephone calls, and because there is no allegation that Plaintiff was

deprived of all alternate methods of communication, that aspect of the complaint fails to state a

plausible claim for relief as against any defendant."); *Ahlers v. Townsend*, No. 9:12-CV-0575

DNH/TWD, 2014 WL 4365277, at *5 (N.D.N.Y. Aug. 28, 2014) ("While a prisoner has a

constitutional right to communicate with the outside world, this right does not include a guarantee of a specific means of communication. Thus, for example, there is no constitutionally guaranteed right of a prisoner to unrestricted use of a telephone.").

Here, Green has not alleged that he was barred from communicating through mail during the period when he was denied access to the telephone. Accordingly, the Court concludes that Green has not alleged a plausible First Amendment claim based on his lack of access to telephone usage.

**Retaliation**

The Second Circuit has "instructed district courts to approach prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act." *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015) (citation omitted). Retaliation claims "stated in wholly conclusory terms" are insufficient. *Id.* (citations omitted). To plead a First Amendment retaliation claim, an inmate must plausibly allege "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against [him or her], and (3) that there was a causal connection between the protected speech and the adverse action." *Brandon v. Kinter*, 938 F.3d 21, 40 (2d Cir. 2019) (citation omitted).

Green's allegation that he refused to provide information for a prison drug investigation constitutes protected activity and satisfies the first element of his retaliation claim. *Burns v. Martuscello*, 890 F.3d 77, 88 (2d Cir. 2018) (inmates "retain a First Amendment interest in

declining to speak."). Grievance filing is also considered protected activity. *Davis v. Goord*, 320 F.3d 346, 352–53 (2d Cir. 2003)(citations omitted).

Green has alleged that after Lieutenant Franco threatened him with future retaliatory action due to his refusal to cooperate in the drug investigation, Lieutenant Franco subsequently orchestrated Green's heightened security risk level on allegedly improper grounds; failed to afford Green telephone calls or regular showers while Green was in segregation; purposely exposed Green to the COVID-19 virus, which required Green to be placed in quarantine; threatened to keep pictures of Green's "girl" and masturbated in front of Green while making insulting and sexually harassing comments; and refused to assist Green in receiving all of his property when he was transferred to MacDougall. Compl. at ¶¶ 33-56. Green's allegations also appear to suggest that Lieutenant Franco took retaliatory action after Green filed a grievance against him by falsely reporting that Green had an SRG affiliation. *Id.* at ¶¶ 58-61. For initial pleading purposes, these allegations are sufficient to satisfy the elements of a First Amendment retaliation claim against Lieutenant Franco.

Green alleges that Officer Ortega wrote the SRG ticket in retaliation for Green's grievance filing and failure to comply with the drug investigation. *Id.* at ¶ 14. Green's claim against Ortega's retaliatory conduct is wholly conclusory. He alleges no facts that indicate that Ortega was at all aware that Green had filed any grievances or refused to cooperate in the drug investigation. Because Green has failed to allege any facts reflecting that Ortega wrote the SRG ticket because of Green's protected speech or conduct, Green has not alleged a plausible First Amendment retaliation claim against Ortega.

Green indicates that his security risk level increase to a Level 4 inmate by Deputy Warden Vasquez constituted a "revenge transfer." Compl. at ¶¶ 13, 38. To the extent Green asserts a First Amendment retaliation claim against Warden Vasquez, his allegations are conclusory; he fails to allege specific facts that reflect the existence of a causal connection between Green's protected speech and activity and Deputy Warden Vasquez's conduct to increase Green's security risk level.

Green has not alleged any facts suggesting that Warden Guadarrama had any personal involvement in retaliatory action taken against Green based on exercise of his First Amendment rights. Accordingly, Green may proceed on a First Amendment retaliation claim against only Lieutenant Franco.

### C.       Fourth Amendment

The Fourth Amendment provides in pertinent part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV. However, the Supreme Court has held that "the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell" because "[t]he recognition of privacy rights for prisoners in their individual cells simply cannot be reconciled with the concept of incarceration and the needs and objectives of penal institutions." *Hudson v. Palmer*, 468 U.S. 517, 526-30 (1984). Nor is the Fourth Amendment applicable to seizures of inmate property by prison officials. *See id.* at 528 n.8 ("the same reasons that lead us to conclude that the Fourth Amendment's proscription against unreasonable searches is inapplicable in a prison cell, apply with controlling force to seizures"); *see also Conquistador v. Syed*, No. 3:19-CV-1450 (KAD), 2020 WL 229319, at *4 (D. Conn.

Jan. 15, 2020) (allegation that inmate's "television and sneakers" were confiscated while inmate was being transported between correctional facilities did not state a claim of an unreasonable seizure under the Fourth Amendment); *Gulino v. Crossdale*, No. 3:12-CV-156 JCH, 2012 WL 3656403, at *2–3 (D. Conn. Aug. 24, 2012) (conduct of correctional officers in removing religious article from inmate's possession prior to his placement in the restrictive housing unit did not state a viable claim of an unreasonable seizure in violation of the Fourth Amendment). Thus, Green cannot allege a Fourth Amendment violation based on the search of his cell or the seizure of his property. *See* Compl. at ¶¶ 46, 56.

In sum, Green has not alleged a plausible Fourth Amendment violation.

### D.    Fourteenth Amendment Procedural Due Process

Although it is not entirely clear, Green appears to assert a violation of his procedural due process rights related to the alleged conduct by Deputy Warden Vasquez and Lieutenant Franco in raising Green's security risk level resulting in his changed status to "pending transfer." Green indicates that under Directive 9.2, "DOC cannot use (2) tickets" (in this instance, Intoxication and Removal from a Program) from the same incident to increase his risk level. Compl. at ¶ 38. This Fourteenth Amendment claim is not plausible under the Due Process Clause.

"[T]he Due Process Clause provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541 (1985). Procedural due process analysis "proceeds in two steps: [a court] first ask[s] whether there exists a liberty or property interest of which a person has been deprived, and if so ... whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke,* 562 U.S. 216, 219

(2011) (per curiam). Liberty interests may arise from either the Due Process Clause itself or "from an expectation or interest created by state laws or policies." *Wilkinson v. Austin,* 545 U.S. 209, 221 (2005). In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court recognized that "States may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Id.* at 483-84. The Supreme Court explained that for prisoners, a liberty interest warranting due process protection "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484 (internal citations omitted).

Green has a protected liberty interest only if the state created such an interest in a statute or regulation and the deprivation of that interest caused him to suffer an atypical and significant hardship. *See Tellier v. Fields,* 280 F.3d 69, 80-81 (2d Cir. 2000). However, "prisoners generally do not have a protected liberty interest in classifications that impact their eligibility to participate in rehabilitative programs," and "Connecticut has not granted inmates, by regulation or statute, a protected interest in their security classification," because "the matter is committed to the discretion of the Commissioner of Corrections." *Taylor v. Levesque,* 246 F. App'x 772, 774 (2d Cir. 2007); *see also Green v. Martin*, 224 F. Supp. 3d 154, 177 (D. Conn. 2016) ("prisoners have no constitutional rights to a particular security classification."); *Hamer v. Arnone,* 2011 WL 2680836, at *3 (D. Conn. July 7, 2011) (concluding that Connecticut prisoners "do not have a protected liberty interest in their classifications because the Commissioner of Correction has discretion to classify prisoners" without addressing the mandatory language of Directive 9.4).

24

Moreover, an inmate has no liberty interest in serving a sentence at a particular location. *See Halloway v. Goord,* No. 9:03-CV-01524, 2007 WL 2789499, at *5 (N.D.N.Y. Sept. 24, 2007) (citing *Wilkinson v. Austin,* 545 U.S. 209, 221-22 (2005)) (other citation omitted).

Accordingly, Green's Fourteenth Amendment claims based on an allegedly procedurally improper increase in his security level or on his transfer must be dismissed as not plausible.

### E.   Fourteenth Amendment Property Claim

Green alleges that he lost personal property when he was transferred to MacDougall. Compl. at ¶¶ 54-56. The Due Process Clause of the Fourteenth Amendment protects the plaintiff against the denial of a protected property interest without due process of law. *Ramos v. Malloy*, No. 3:18-CV-615 (VAB), 2018 WL 1936144, at *3 (D. Conn. Apr. 24, 2018). A prisoner can state a due process claim for loss of property if the state has not created adequate post-deprivation remedies. *See Edwards v. Erfe*, 588 Fed. App'x. 79, 80 (2d. Cir. 2015); *Hudson*, 468 U.S. at 533. "The existence of state remedies, therefore, determines whether a Fourteenth Amendment claim for deprivation of property without due process is cognizable in federal court." *Conquistador v. Hannah*, No. 3:19-cv-1293 (KAD), 2019 WL 4346346, at *4 (D. Conn. Sept. 12, 2019).

Here, the DOC has established an administrative remedy procedure relevant to an inmate's lost or destroyed property. *Ramos v. Malloy*, No. 3:18-CV-615 (VAB), 2018 WL 1936144, at *3 (D. Conn. April 24, 2018). Additionally, the State of Connecticut provides a remedy for lost or destroyed property. Under Connecticut General Statutes § 4-141, *et seq.*, a prisoner may bring a claim in the Connecticut Claims Commission, unless there is another administrative remedy for his claim. *See* Conn. Gen. Stat. § 4-142. Green must seek relief for

a deprivation of his property though these adequate post-deprivation remedies rather than the

court. *Id.* This claim will be dismissed.

    **F.    Claims Against the MacDougall Defendants**

    Green's allegations may be construed to assert Fourteenth Amendment procedural due

process violations in connection with the SRG affiliation guilty finding and classification and

Eighth Amendment claims concerning his MacDougall SRG Unit conditions against the

MacDougall Defendants.[5]  The Court concludes that these claims and the MacDougall

Defendants have been misjoined in this action.

    Federal Rule of Civil Procedure 20 permits joinder of multiple defendants in one action

only if "any right to relief is asserted against them jointly, severally, or in the alternative with

respect to or arising out of the same transaction, occurrence, or series of transactions and

occurrences, and any question of law or fact common to all defendants will arise in the action."

Fed. R. Civ. P. 20(a)(2). The court approaches the determination of "[w]hat [might] constitute

the same transaction or occurrence . . . on a case by case basis."  *Kehr ex rel. Kehr v. Yamaha*

*Motor Corp., U.S.A.*, 596 F. Supp. 2d 821, 826 (S.D.N.Y. 2008) (citation omitted).[6]

    Rule 21 of the Federal Rules of Civil Procedure provides that a court "may sever any

---

[5]  Green cannot assert that his constitutional rights were violated based on a false accusation of SRG affiliation because a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) (citations omitted).

[6]  In interpreting the terms transaction or occurrence as used in Rule 13(a), Fed. R. Civ. P., the Second Circuit has observed that whether a counterclaim arises out of the same transaction as the original claim depends upon an assessment of "the logical relationship between the claims" and a determination of whether the "essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." *Harris v. Steinem*, 571 F.2d 119, 123 (2d Cir. 1978) (citations omitted). The court applies an analogous interpretation to the terms transaction or occurrence as used in Rule 20(a)(2).

claim against a party" pursuant to a motion filed by a party to the action or on its own. Fed. R. Civ. P. 21. In exercising its discretion to decide whether to sever a claim, a court should weigh the following factors: "(1) [do] the claims arise out of the same transaction or occurrence; (2) [do] the claims present some common question of law or fact; (3) [would] settlement of the claims or judicial economy be facilitated; (4) will prejudice [] be avoided; and (5) [will] different witnesses and documentary proof [be] required for the separate claims." *Costello v. Home Depot U.S.A., Inc.*, 888 F. Supp. 2d 258, 263–66 (D. Conn. 2012) (citation omitted).

Green's claims arising from his SRG guilty finding and classification and his MacDougall SRG Unit conditions do not arise out of the same transaction or occurrence as his plausible constitutional claims arising from his exposure to COVID-19, sexual harassment or retaliation by Lieutenant Franco at Osborn. The Eighth and First Amendment claims arising at Osborn are not reasonably related to the claims arising from Green's SRG guilty finding and classification and his conditions at MacDougall. Different witnesses/testimony and documentary evidence will be required to prove the separate sets of claims at trial. Judicial economy would not be served by trying all of the claims together as different sets of evidence would need to be presented at trial or considered in settlement negotiations. Thus, Green's claims against the MacDougall Defendants are not properly joined in this action, and the relevant factors favor severance and dismissal of these claims without prejudice.

The Court will sever and dismiss without prejudice Green's claims arising from his SRG guilty finding and classification and his MacDougall conditions of confinement against the MacDougall Defendants. Green may pursue these claims in separate actions. *See Lindsay v. Semple*, No. 3:19-CV-751 (JCH), 2019 WL 3317320, at *10–11 (D. Conn. July 24, 2019)

27

(severing and dismissing without prejudice all claims unrelated to due process claim as improperly joined in violation of Fed. R. Civ. P. 20) (citing *Wilson v. McKenna*, No. 3:12-cv-1581 (VLB), 2015 WL 1471908, at *6 (D. Conn. Mar. 31, 2015) (advising plaintiff that improperly joined claims must be pursued in separate actions)).

### G.    Official Capacity Claims

Green has sued the defendants in their official capacities and seeks a declaratory judgment that his constitutional rights have been violated.

To the extent that Green seeks damages against defendants in their official capacities, any such claims must be dismissed. *See e.g., Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (explaining that claims for money damages against state employees in federal court are barred by the Eleventh Amendment).

In *Ex parte Young*, 209 U.S. 123 (1908), the United States Supreme Court recognized a limited exception to the Eleventh Amendment's grant of sovereign immunity from suit to permit a plaintiff to sue a state official acting in an official capacity for prospective injunctive relief for continuing violations of federal law. *Id.* at 155–56; *In re Dairy Mart Convenience Stores, Inc.*, 411 F.3d 367, 371 (2d Cir. 2005). A plaintiff may seek injunctive relief against a state official only to the extent that he alleges an ongoing violation of federal law. *See, e.g., Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)). However, the exception to Eleventh Amendment immunity "does not permit judgments against state officers declaring that they violated federal law in the past." *See P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy*, 506 U.S. 139, 146 (1993).

Green is seeking a declaratory judgment stating that defendants have violated his

constitutional rights. Because he seeks a declaratory judgment based on past conduct, this request is barred by the Eleventh Amendment. *Green v. Mansour*, 474 U.S. 64, 68 (1985) ("We have refused to extend the reasoning of *Young* . . . to claims for retrospective relief."). Moreover, if Green were to prevail on any constitutional claim proceeding in this action, a judgment in his favor would serve the same purpose as a declaration that Defendants violated his constitutional rights. A "dismissal of a declaratory judgment action is warranted where the declaratory relief plaintiff seeks is duplicative of his other causes of action." *Kuhns v. Ledger*, 202 F. Supp. 3d 433, 443 (S.D.N.Y. 2016). Thus, Green's request for declaratory relief is not distinct from the relief sought in his section 1983 claim and is dismissed. *See, e.g., United States v. $2,350,000.00 in Lieu of One Parcel of Property Located at 895 Lake Avenue, Greenwich, Connecticut*, 718 F. Supp. 2d 215, 229 n.7 (D. Conn. 2010) (noting that if property is not forfeited, receiver-claimants would have been shown to be prevailing innocent owners and declaration to that effect would be redundant). Accordingly, Green's official capacity claims for declaratory relief and damages are dismissed.

## IV.   ORDERS

For the foregoing reasons, the Court enters the following orders.

(1) The case shall proceed on Green's Eighth Amendment claims against Lieutenant Franco in his individual capacity based on exposing Green to COVID-19 and sexually harassing him; and on Green's First Amendment retaliation claim against Lieutenant Franco in his individual capacity.

All other claims against Defendants Lieutenant Franco, Warden Guadarrama, Deputy Warden Vasquez, Correction Officer Ortega and CTO Grady are DISMISSED without prejudice under 28 U.S.C. § 1915(b)(1). If Green believes he can allege facts to cure the deficiencies

29

identified in this ruling, he may file a motion to amend and attach an amended complaint within **thirty (30) days** from the date of this order. He is advised that any amended complaint will completely replace the prior complaint in the action, and that no portion of any prior complaint may be incorporated into his amended complaint by reference. Green must name each defendant against whom he asserts claims in the case caption.

Green's section 1983 claims arising from his SRG guilty finding and classification and from his SRG conditions of confinement against the MacDougall Defendants (Captain Concepcion, Captain Stanley, Correction Officer Mathews, Correction Officer Mancini, Disciplinary Hearing Officer Brown, Captain Salius, and District Administrator Nick Rodriguez) are **SEVERED** and **DISMISSED** without prejudice pursuant to Rules 20 and 21, Fed. R. Civ. P. Green may pursue these claims in separate actions.

(2) The clerk shall verify the current work addresses for Lieutenant Franco with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to Defendant Franco at his confirmed addresses within **twenty-one (21) days** of this Order, and report on the status of the waiver request on the **thirty-fifth (35th) day** after mailing. If Defendant Franco fails to return the waiver request, the clerk shall make arrangements for in-person individual capacity service by the U.S. Marshals Service on Defendant, and Defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(3) The clerk shall mail a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs and the Office of the Attorney General.

(4) Defendant Franco shall file a response to the amended complaint, either an answer or

motion to dismiss, within **sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to him. If Defendant Franco chooses to file an answer, he shall admit or deny the allegations and respond to the cognizable claims recited above. Defendant Franco may also include any and all additional defenses permitted by the Federal Rules.

(5) Discovery, according to Federal Rules of Civil Procedure 26-37, shall be completed within **six months (180 days)** from the date of this Order. Discovery requests need not be filed with the Court.

(6) The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures," which will be sent to both parties by the Court. The Order can also be found at http://ctd.uscourts.gov/administrative-standing-orders.

(7) All motions for summary judgment shall be filed within **seven months (210 days)** from the date of this Order.

(8) According to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion within **twenty-one (21) days** of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(9) If Plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he MUST notify the Court. Failure to do so can result in the dismissal of the case. The plaintiff must give notice of a new address even if he is incarcerated. He should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of change of

address. He should also notify the defendant or defense counsel of his new address.

_____/s/_____
Michael P. Shea, U.S.D.J.

**SO ORDERED** this 6th day of April 2022, at Hartford, Connecticut.